Filed 1/15/25

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| L.W., a Minor, etc., et al., | C098701 |
| Plaintiffs and Appellants, | (Super. Ct. No. S-CV-0048888) |
| v. | |
| AUDI AG, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Placer County, Michael W. Jones, Judge. Reversed with directions.

The Brandi Law Firm, Daniel Dell'Osso and Brian Malloy; Kaufman Law and Casey A. Kaufman for Plaintiffs and Appellants.

King & Spaulding, Paul R. Johnson, Susan V. Vargas and Stephanie A. Le for Defendant and Respondent.

This is a products liability suit stemming from a car accident involving an allegedly defective Audi Q7.  The trial court determined that defendant Audi AG (Audi), the German company that manufactures Audi vehicles in Germany and uses an American company to import, market, and sell those vehicles to authorized Audi dealerships across the United States, was not subject to personal jurisdiction in California under a "stream-of-commerce" theory.  (See *Goodyear Dunlop Tires Operations, S. A. v. Brown* (2011) 564 U.S. 915, 926 [explaining that the stream-of-commerce metaphor is often invoked in products liability cases where a product has traveled through a chain of distribution before reaching the consumer; "[t]ypically, in such cases, a nonresident defendant, acting *outside* the forum, places in the stream of commerce a product that ultimately causes harm *inside* the forum"].)  Plaintiffs L.W. and several members of his family appealed from the order granting Audi's motion to quash service of summons for lack of personal jurisdiction.  For the reasons we next explain, we reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

The following facts are taken from the operative pleading (first amended complaint) and the evidence submitted in connection with the motion to quash except that to which objections were made and sustained.

*First Amended Complaint*

In August 2020, minor L.W. allegedly suffered severe injuries when he was struck by his mother's Audi Q7 while he was inside his garage in Roseville.  L.W., his mother, and his two minor siblings brought suit against various entities, including Audi and Volkswagen Group of America Inc. dba Audi of America, Inc., (VWGoA), asserting negligence and products liability claims.  As for the accident, plaintiffs alleged L.W. was "crushed" against the garage wall when the Audi Q7 "surged forward" after his mother

2

put the vehicle in park and got out while it was running.[1]  Among other things, plaintiffs asserted that the Audi Q7 was a defective product because it did not have the available "rollaway mitigation features" or technologies installed (e.g., visual and auditory warnings alerting a driver when the vehicle is not in park), which was a substantial factor in causing the injuries sustained in this case.

*Audi and its Relationship with VWGoA and Audi of America, LLC*

Audi is a German company, with its headquarters and principal place of business in Germany.  At all relevant times, Audi designed, manufactured, and sold Audi vehicles to VWGoA in Germany, including the subject Audi Q7.  It is undisputed that Audi is a successful global automotive company, that Audi owns and has registered several trademarks with the United States Patent and Trademark Office, and that the United States is one of the primary or "core" markets for the retail sale of Audi-manufactured vehicles.  In 2019, over 224,000 cars made by Audi were delivered to the United States.  It is also undisputed that the subject Audi Q7 was "first sold" in the United States by an Audi dealership in Santa Monica.[2]

---

[1]  The first amended complaint described the accident as follows:  At approximately 8:30 a.m. on August 17, 2020, L.W.'s mother started the engine of her Audi Q7 while it was inside the garage.  After putting the vehicle in park, she got out to assist her minor son (L.W.) with getting into the vehicle.  After she exited the vehicle, it moved rearward without warning, trapping her hand between the vehicle's door and the Jeep that was parked next to it.  In order to free herself, the mother instructed her minor daughter (P.W.) to get into the driver's seat of the Audi Q7, press the brake, shift the vehicle into drive, and then release the brake.  When P.W. did as instructed, the Audi Q7 "surged forward," crushing L.W. against the garage wall.  According to P.W., when she got into the driver's seat of the Audi Q7, the gear shift indicated that the vehicle was in park.

[2]  The trial court sustained Audi's objections (hearsay, lack of foundation, lack of authentication) to the CarFax report attached to plaintiffs' counsel's declaration.  Audi, however, did not object to or dispute counsel's assertion in his declaration that the subject Audi Q7 was originally sold in the United States by an Audi dealership in Santa Monica.  At no point has Audi disputed that plaintiffs purchased the subject vehicle in California.

3

VWGoA, incorporated in New Jersey and headquartered in Virginia, is a separate, distinct, and independent corporate business entity from Audi. It was engaged by Audi to serve as the exclusive importer and distributor of Audi-manufactured vehicles in the United States. In that capacity, VWGoA purchases vehicles from Audi in Germany (including the subject Audi Q7) and then independently sells them to authorized Audi dealerships across the United States (including dealerships in California), that then sell the vehicles directly to consumers. In connection with these activities, VWGoA does business as Audi of America, Inc. VWGoA has a wholly owned subsidiary named Audi of America, LLC, a Delaware limited liability company. The "primary purpose" of this subsidiary "is to allow Audi AG in Germany to recognize the financial results of the Audi business in the United States . . . through a 'control agreement,' whereby Audi AG has the right to designate the directors of Audi of America, LLC." The subsidiary also "acts as the employer of record for most Audi brand employees under VWGoA."

VWGoA is the registrant of the Internet domain name "audiusa.com" and is the only entity that markets, advertises, and sells Audi-manufactured vehicles in the United States. Audi does not directly sell vehicles to consumers in the United States, nor does it have any marketing strategy or marketing campaign for Audi-manufactured vehicles in the United States. VWGoA has complete and exclusive decision-making authority, control, discretion, and oversight concerning which Audi-manufactured vehicles will be delivered, marketed, and sold in California. VWGoA and Audi have separate offices, facilities, boards of directors, officers, and employees. Audi does not manage VWGoA's finances or payroll, and the companies do not share accounts. Nor does Audi exercise day-to-day control over VWGoA or any authorized Audi dealer in the United States. Audi does not determine which dealers are authorized to sell and service Audi-manufactured vehicles in the United States, and Audi did not issue any new vehicle warranties to any consumer with regard to the subject Audi Q7.

While Audi-manufactured vehicles sold to VWGoA are designed and manufactured to comply with American federal and state regulatory requirements, Audi does not design or manufacture vehicles to be sold only in California, or to appeal specifically to California residents. The Audi-manufactured vehicles that VWGoA markets and sells in California are designed and manufactured to be sold throughout the United States, as opposed to specifically in California. According to Audi, it does not "influence or encourage any marketing to California specifically as opposed to the entire United States" in general.

Audi has no offices or facilities in California, is not qualified, licensed, authorized, or registered to do business in California, does not own real estate or pay taxes in California, does not have a mailing address or telephone number in California, and does not maintain any bank accounts in California. Audi does not have a registered agent or other person authorized to accept service of process in California.

*Motion to Quash*

In response to the first amended complaint, Audi specially appeared and filed a motion to quash service of summons for lack of personal jurisdiction. Plaintiffs opposed the motion, arguing that California courts had the authority to exercise personal jurisdiction over Audi. Plaintiffs did not claim there were sufficient facts to support general jurisdiction. Rather, they argued that specific jurisdiction existed under a steam-of-commerce theory because Audi indirectly and systemically served the California automobile market by delivering its products (Audi-manufactured vehicles) into the steam-of-commerce through its national distributor VWGoA, with the expectation that the vehicles would be purchased by consumers from authorized Audi dealerships in California. Plaintiffs claimed that the purposeful availment and relatedness requirements of specific jurisdiction were satisfied because Audi (working together with VWGoA) deliberately served (i.e., exploited) the automobile market in the United States (including California) for the purpose of obtaining economic benefit, and because plaintiffs had

sustained injuries in California as a result of a car accident involving an allegedly defective Audi Q7 originally purchased by a California resident from a dealership in Santa Monica. In support of their position, plaintiffs noted that a then-recent case decided by the United States Supreme Court--*Ford Motor Company v. Montana Eighth Judicial District Court* (2021) 592 U.S. 351 (*Ford*)--held that, contrary to Audi's contention in its moving papers, neither the place a vehicle is manufactured nor the place of the original sale of the vehicle is relevant for purposes of establishing specific jurisdiction over a foreign manufacturer defendant.

In its reply brief, Audi asserted that plaintiffs had failed to present sufficient evidence to justify the exercise of personal jurisdiction. As support for its position, Audi asserted that the relevant "uncontradicted facts" were set forth in the declaration of Michael Stadler, an Audi "product expert" who was "personally familiar with and knowledgeable about the business functions and organization of Audi." Those facts included that VWGoA was the exclusive entity that acquired Audi-manufactured vehicles from Audi in Germany, imported the vehicles into the United States, marketed the vehicles in the United States, and distributed the vehicles to authorized Audi dealerships across the United States, including dealerships in California. Based on these facts (and others stated in the Stadler declaration), Audi urged the trial court to reject plaintiffs' "bare" stream-of-commerce theory, insisting that specific jurisdiction in a products liability case is not justified unless a defendant themselves "conducted relevant activities in the forum State." Audi claimed that a foreign manufacturer is not subject to personal jurisdiction in a forum state if it did not conduct activities in that state and did not directly send its products to that state. In other words, Audi asserted that California could *never* exercise personal jurisdiction over a foreign manufacturer (such as Audi) when that manufacturer relies on a separate entity (a national distributor such as VWGoA) to

distribute, market, and sell its products in that state.[3]  In making this argument, Audi did not dispute that there are numerous Audi dealerships in California that use Audi's registered trademarks (including a dealership in Santa Monica called "Santa Monica Audi")[4] or that Audi-manufactured vehicles are marketed in California.  Nor did Audi dispute that it had registered its trademarks in the United States and had participated in various federal lawsuits with VWGoA to enforce those trademarks.  Further, Audi set forth that "Audi of America, Inc." is a "registered d/b/a of VWGoA," that "*audiusa.com* is registered by VWGoA, and that anyone opening *audi.com* who seeks information about Audi of America is redirected to *audiusa.com*."

*Trial Court's Ruling*

After a hearing, the trial court granted Audi's motion to quash, finding no personal jurisdiction.  The court concluded that plaintiffs had failed to meet their burden to present admissible evidence establishing the requisite facts (i.e., minimum contacts) to justify the exercise of personal jurisdiction over Audi.  Specifically, the court found that plaintiffs

---

[3]  Audi continues to assert this position in its appellate briefs and at oral argument, as we discuss in more detail *post*.

[4]  Audi did, however, object to the evidence plaintiffs submitted to show that Audi had 44 dealerships in California that were using Audi's registered trademarks on various grounds, including hearsay, lack of personal knowledge, lack of foundation, lack of authentication, and relevancy.  Among other things, Audi argued that the number of Audi dealerships in California (none of which were owned by Audi) had "no tendency in reason to prove or disprove any disputed fact . . . of consequence to the determination of [the] motion to quash."  As noted *post*, in granting the motion to quash summons, the trial court issued a blanket evidentiary ruling, sustaining (without explanation) each and every objection lodged by Audi.  On appeal, Audi again argues the number of dealerships is irrelevant.  Audi confirmed its position in oral argument that no amount of additional discovery would cure the perceived dearth of evidence regarding jurisdiction.  According to Audi, this is because Audi *itself* would never have the requisite contacts with California, regardless of the volume of its product flowing to and sold in California through its contracted distributor VWGoA.

7

had not sufficiently established the purposeful availment requirement or the relatedness requirement of specific jurisdiction. The court also found that plaintiffs had failed to show that the exercise of jurisdiction would be reasonable and consistent with notions of fair play and substantial justice. In so finding, the court explained:

"Plaintiffs submit evidence of Audi AG's prowess as a global luxury automaker. The submitted evidence, however, provides general discussion as to Audi AG's global success along with its success generally in the US market. Plaintiffs' admissible evidence does not sufficiently establish Audi AG conducts significant business in California. Indeed, the only admissible evidence submitted regarding the sale of Audi vehicles in California pertains to the sale of the subject Audi Q7 in Santa Monica, California. This court recognizes that an automobile manufacturer can be seen as purposefully availing itself to the laws of the state through the indirect effort to service the California vehicle market. [Citation.] Nonetheless, this still requires plaintiffs to submit evidence to establish Audi AG's activities within *California*. The only evidence presented by plaintiffs to demonstrate Audi AG's economic activity in California is the sale of the Audi Q7 in Santa Monica. This singular sale of an Audi vehicle does not equate to Audi AG purposefully availing itself to the laws of California.

"The same is true for the second element. The complaint alleges claims based upon various alleged defects in the vehicle. Plaintiffs attempt to connect Audi AG to the activities of [VWGoA] to draw a substantial connection between the vehicle and plaintiffs' injuries. Once again, the submitted evidence tends to show an interrelation between Audi AG and [VWGoA] that is not tied to California. Plaintiffs admissible evidence does not establish Audi AG advertised, marketed, or solicited buyers in California. There is simply insufficient evidence presented by plaintiffs that Audi AG, even through some purported link [VWGoA] , cultivated or systematically served the California consumer market.

"Finally, plaintiffs have not made a sufficient showing that the exercise of jurisdiction would be reasonable and consistent with notions of fair play and substantial justice. To reiterate, the state of the admissible evidence is such that plaintiffs seek to have a foreign manufacturer defend a negligence/product liability case in California based upon the sale of a singular vehicle. This falls well short of meeting the notions of fair play and substantial justice. For these reasons, the motion [to quash] is granted."[5]

*Appeal*

Plaintiffs timely appealed. They claim the trial court erred in finding that "Audi did not purposely avail itself to California," as well as in denying plaintiffs' request for jurisdictional discovery. Contained within the latter claim is the argument that the court abused its discretion in striking plaintiffs' evidence offered in support of jurisdiction. Because we agree with plaintiffs that the record supports subjecting Audi to specific personal jurisdiction in California under the stream-of-commerce theory, we need not and do not address the remaining claims.

## DISCUSSION

### I

*Personal Jurisdiction*

Plaintiffs first argue the trial court erred in granting Audi's motion to quash service of summons for lack of personal jurisdiction. Plaintiffs contend reversal is

---

[5] As plaintiffs correctly point out, the trial court erroneously placed the burden on them to show that the exercise of personal jurisdiction over Audi would be reasonable and consistent with notions of fair play and substantial justice. As discussed *post*, it is well established that, on a motion to quash summons for lack of personal jurisdiction, the plaintiff has the initial burden to demonstrate facts (i.e., minimum contacts) justifying the exercise of personal jurisdiction. (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 449.) If the plaintiff meets this initial burden, then the burden shifts to the defendant to show that California's assertion of personal jurisdiction would be unreasonable because it fails to comport with "traditional notions of fair play and substantial justice." (*Id.* at p. 444; see *id.* at pp. 447, 449.)

9

required because there were sufficient facts (i.e., minimum contacts) to justify the trial court's exercise of specific jurisdiction over Audi under a stream-of-commerce theory. We agree.

A. *General Principles of Personal Jurisdiction*

"The Fourteenth Amendment's Due Process Clause limits a state court's power to exercise jurisdiction over a defendant." (*Ford, supra*, 592 U.S. at p. 358.) As a general rule, the exercise of judicial power is not lawful unless the defendant "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." (*Hanson v. Denckla* (1958) 357 U.S. 235, 253.)

"Under California's long-arm statute, California state courts may exercise personal jurisdiction 'on any basis not inconsistent with the Constitution of this state or of the United States.' [Citation.] California's long-arm statute allows the exercise of personal jurisdiction to the full extent permissible under the U. S. Constitution." (*Daimler AG v. Bauman* (2014) 571 U.S. 117, 125.) " 'The exercise of jurisdiction over a nonresident defendant comports with these Constitutions "if the defendant has such minimum contacts with the state that the assertion of jurisdiction does not violate ' "traditional notions of fair play and substantial justice." ' " ' " (*Snowney v. Harrah's Entertainment, Inc*. (2005) 35 Cal.4th 1054, 1061 (*Snowney*).)

" 'The concept of minimum contacts . . . requires states to observe certain territorial limits on their sovereignty. It "ensure[s] that the States, through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system." ' [Citations.] To do so, the minimum contacts test asks 'whether the "quality and nature" of the defendant's activity is such that it is "reasonable" and "fair" to require him to conduct his defense in that State.' [Citations.] The test 'is not susceptible of mechanical application; rather, the facts of each case must be weighed to determine whether the requisite "affiliating circumstances" are present.' " (*Snowney*, *supra*, 35 Cal.4th at p. 1061.) "Minimum contacts exist where the defendant's conduct

10

in, or in connection with, the forum state is such that the defendant should reasonably anticipate being subject to suit in that state." (*BBA Aviation PLC v. Superior Court* (2010) 190 Cal.App.4th 421, 429.)

There are two kinds of personal jurisdiction: general (sometimes called "all purpose") jurisdiction and specific (sometimes called "case-linked") jurisdiction. (*Bristol-Myers Squibb Co. v. Superior Court* (2017) 582 U.S. 255, 262.) General jurisdiction extends to any and all claims brought against a defendant, and is available only in a state where a defendant is " 'essentially at home.' " (*Ford, supra*, 592 U.S. at p. 358; see *Daimler AG v. Bauman, supra,* 571 U.S. at p. 137 [an individual is subject to general jurisdiction in his or her place of domicile, whereas a corporation is subject to general jurisdiction in its place of incorporation and principal place of business].) By contrast, specific jurisdiction "covers defendants less intimately connected with a State, but only as to a narrower class of claims. The contacts needed for this kind of jurisdiction often go by the name 'purposeful availment.' [Citation.] The defendant . . . must take 'some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum State.' " (*Ford,* at p. 359.) The parties agree that only specific jurisdiction is at issue here.

"When determining whether specific jurisdiction exists, courts consider the ' "relationship among the defendant, the forum, and the litigation." ' [Citations.] A court may exercise specific jurisdiction over a nonresident defendant only if: (1) 'the defendant has purposefully availed himself or herself of forum benefits' [citation]; (2) 'the "controversy is related to or 'arises out of' [the] defendant's contacts with the forum" ' [citations]; and (3) ' "the assertion of personal jurisdiction would comport with 'fair play and substantial justice' " ' " (*Pavlovich v. Superior Court* (2002) 29 Cal.4th 262, 269, abrogated on another ground as stated in *David L. v. Superior Court* (2018) 29 Cal.App.5th 359, 369-370, 372; see also *Snowney, supra*, 35 Cal.4th at p. 1062.) But we must "exercise ' "[g]reat care and reserve . . . when extending our notions of personal

11

jurisdiction into the international field" ' " and " 'we apply jurisdictional principles with an abundance of caution where the defendant is a foreign corporation.' " (*Rivelli v. Hemm* (2021) 67 Cal.App.5th 380, 393.) In doing so, we are guided by the principal that the doctrine of specific jurisdiction is intended primarily to safeguard the due process rights of the defendant being haled into court and not the interests of the plaintiff in obtaining a convenient forum. (See *Ford, supra*, 592 U.S. at p. 360 [the rules concerning specific jurisdiction "reflect two sets of values—treating defendants fairly and protecting 'interstate federalism' "]; *Walden v. Fiore* (2014) 571 U.S. 277, 284 ["Due process limits on the State's adjudicative authority principally protect the liberty of the nonresident defendant—not the convenience of plaintiffs or third parties. [Citation.] We have consistently rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum State"].)

When a defendant moves to quash service of summons for lack of personal jurisdiction, the plaintiff has the initial burden of demonstrating facts justifying the exercise of jurisdiction. (*Vons Companies, Inc., v. Seabest Foods, Inc., supra*, 14 Cal.4th at p. 449; *Snowney, supra,* 35 Cal.4th at p. 1062.) To meet this burden for specific jurisdiction, the plaintiff must establish the purposeful availment and relatedness requirements by a preponderance of the evidence. (*Snowney*, at p. 1070; *Farina v. SAVWCL III, LLC* (2020) 50 Cal.App.5th 286, 293.) If the plaintiff meets their initial burden, then the burden shifts to defendant to present a compelling case that the exercise of jurisdiction would be unreasonable because it fails to comport with " ' "traditional notions of fair play and substantial justice." ' " (*Snowney, supra,* 35 Cal.4th at p. 1061; *Burger King Corp. v. Rudzewicz* (1985) 471 U.S. 462, 476-477.)

In reviewing a trial court's order granting a motion to quash for lack of personal jurisdiction, we independently review the trial court's legal conclusions when no conflict in the evidence exists. (*Snowney, supra*, 35 Cal.4th at p. 1062; *Pavlovich v. Superior*

*Court, supra*, 29 Cal.4th at p. 273.)  When there is conflicting evidence, we will not disturb the trial court's express or implied factual findings if they are supported by substantial evidence.  (*Pavlovich*, at p. 273.)  The ultimate question of whether personal jurisdiction exists, based on the facts that are undisputed and those found by the trial court that are supported by substantial evidence, is a legal determination subject to our independent review.  (See *ViaView, Inc. v. Retzlaff* (2016) 1 Cal.App.5th 198, 210.)

B.  *Stream-of-Commerce Jurisprudence*

The stream-of-commerce theory of personal jurisdiction stems from *World-Wide Volkswagen Corp. v. Woodson* (1980) 444 U.S. 286 (*World-Wide Volkswagen*).  There, the United States Supreme Court explained:

"When a corporation 'purposefully avails itself of the privilege of conducting activities within the forum State,' [citation], it has clear notice that it is subject to suit there, and can act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the State.  Hence, *if the sale of a product of a manufacturer or distributor such as Audi or Volkswagen is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others*.  The forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the *stream of commerce* with the expectation that they will be purchased by consumers in the forum State."  (*Id*. at pp. 297-298, italics added.)

*World-Wide Volkswagen* involved a New York car dealership (Seaway Volkswagen, Inc.) that sold vehicles solely in the New York market, and a New York distributor (World-Wide Volkswagen Corp.) that supplied vehicles to retailers in three States only:  New York, Connecticut, and New Jersey.  (*World-Wide Volkswagen, supra,* 444 U.S. at pp. 288-289.)  New York residents had purchased a new Audi vehicle from the New York dealer and were driving the vehicle through Oklahoma on their way to Arizona.  (*Id*. at p. 288.)  While in Oklahoma, another car struck the Audi in the rear, causing a fire that severely burned the Audi's occupants.  (*Ibid*.)  In rejecting the

13

Oklahoma courts' exercise of personal jurisdiction over the New York dealer and distributor, the United States Supreme Court observed that the defendants had done nothing to serve the market for cars in Oklahoma (e.g., regularly sell cars to residents, solicit business through advertising in the state). (*Id.* at pp. 295-298.) Personal jurisdiction, the court held, could not be based on the customer's unilateral act of driving the vehicle to Oklahoma. (*Id.* at p. 298.) Notably, the foreign manufacturer of the vehicle (Audi NSU Auto Union Aktiengesellschaft) and its nationwide importer (Volkswagen of America, Inc.) did not contest jurisdiction. (*Id.* at p. 288 & fn. 3.) Thus, the court had no occasion to decide whether the foreign manufacturer was subject to personal jurisdiction in Oklahoma under a stream-of-commerce theory. However, the opinion in *World-Wide Volkswagen* suggested that an objection to personal jurisdiction by this defendant would have been rejected.

Since *World-Wide Volkswagen* established the stream-of-commerce theory of personal jurisdiction, United States Supreme Court justices have provided competing versions of the scope of the theory in plurality decisions. The seminal stream-of-commerce case, *Asahi Metal Industry Co., Ltd. v. Superior Court* (1987) 480 U.S. 102 (*Asahi*), resulted in three competing opinions, none of which garnered a majority as to the proper standard for exercising personal jurisdiction over a foreign manufacturer in a suit alleging injuries caused by its products in the forum state. *Asahi* arose out of a motorcycle accident in California. The plaintiff, a California resident injured in the accident, filed a products liability action against the Taiwanese manufacturer of the tire valves for the motorcycle's tire tubes, claiming that defects in the manufacturer's product caused the accident. (*Id.* at pp. 105-106.) Justice Brennan, joined by three justices, would have found personal jurisdiction under a stream-of-commerce theory "[a]s long as a participant . . . is aware that the final product is being marketed in the forum State." (*Id.* at p. 117 (conc. & dis. opn. of Brennan, J., joined by White, J., Marshall, J., and Blackmun, J.).) Justice Brennan concluded that *World-Wide Volkswagen's* articulation of

14

the stream-of-commerce theory should not be altered (*Id*. at pp. 116-117, 120-121 (conc. & dis. opn. of Brennan, J.), explaining that the theory "refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacture to distribution to retail sale." (*Id*. at p. 117 (conc. & dis. opn. of Brennan, J.) [noting that the possibility of a lawsuit under such circumstances cannot come as a surprise, nor would such a lawsuit present a burden for which there is no corresponding benefit].)  By contrast, Justice O'Connor, also joined by three justices, adopted a stricter interpretation of the stream-of-commerce theory (sometimes referred to as the stream-of-commerce plus approach).  Justice O'Connor posited that the "placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State." (*Id*. at p. 112 (plur. opn. of O'Connor, J.).)  Rather, she would have required some "[a]dditional conduct of the defendant [indicating] an intent or purpose to serve the market in the forum State" (e.g., designing the product for the market in the forum state, advertising in the forum state, establishing channels for providing regular advice to customers in the forum state, marketing the product through a distributor who has agreed to serve as the sales agent in the forum state).  (*Ibid*. (plur. opn. of O'Connor, J.).)  A defendant's mere awareness "that the stream of commerce may or will sweep the product into the forum State" is not enough.  (*Ibid*. (plur. opn. of O'Connor, J.).)  In rejecting specific jurisdiction, Justice O'Connor emphasized that the defendant *themselves* did not do business in California, did not advertise or otherwise solicit business in California, did not create, control, or employ the distribution system that brought its valves to California, and there was no evidence that the defendant designed its product in anticipation of sales in California.  (*Id*. at pp. 112-113 (plur. opn. of O'Connor, J.).)  Finally, Justice Stevens, joined by two justices, found "the volume, the value, and the hazardous character" of the product affects the " 'purposeful availment' " determination.  (*Id*. at p. 122 (conc. & dis. opn. of Stevens, J., joined by White, J., Marshall, J., and Blackmun, J.) [explaining that he "would be inclined to

15

conclude that a regular course of dealing that results in deliveries of over 100,000 units annually over a period of several years would constitute 'purposeful availment' even though the item delivered to the forum State was a standard product marketed throughout the world"].)

In 2011, a similarly divided court evaluated the stream-of-commerce theory in *J. McIntyre Machinery, Ltd. v. Nicastro* (2011) 564 U.S. 873 (*J. McIntyre*).) Like *Asahi*, *J. McIntyre* is a fractured opinion that did not garner a majority. Justice Kennedy, joined by three justices, rejected Justice Brennan's concurrence in *Asahi* and adopted Justice O'Conner's stricter stream-of-commerce plus approach. (*J. McIntyre,* at pp. at 883-885 (plur. opn. of Kennedy, J.).) Justice Breyer, joined by one justice, concurred in the court's judgment, but he refused to expressly endorse Justice O'Connor's approach. Instead, Justice Breyer concluded that the case was appropriately resolved by existing precedent (e.g., *World-Wide Volkswagen, Asahi*). (*J. McIntyre,* at pp. 888-893 (conc. opn. of Breyer, J., joined by Alito, J.).) Because Justice Breyer's concurring opinion "furnished the narrowest grounds for the decision," it is the controlling opinion. (See *Marks v. United States* (1977) 430 U.S. 188, 193 (1977) ["When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds' "].)

Justice Breyer's narrow concurrence concluded that a foreign manufacturer's sale of products to an American distributor with the intent the products would be sold to anyone in America willing to buy them accompanied by a single isolated sale of the product in the forum state, without more, was insufficient to establish the minimum contacts necessary for a court to exercise personal jurisdiction over the manufacturer, even if its product ultimately causes injury in the forum state. Like Justice Kennedy's plurality opinion, Justice Breyer found that mere foreseeability or mere awareness that a product made its way into the forum state while in the stream-of-commerce was not a

16

sufficient basis to establish personal jurisdiction, at least where products were not sold in a state as part of the regular and anticipated flow of commerce into that state. (See *J. McIntyre*, *supra*, 564 U.S. at pp. 887-893 (conc. opn. of Breyer, J.).) In *J. McIntyre*, the plaintiff was injured by a metal-shearing machine, which was produced by a manufacturer in England and sold to a national distributer who sold that machine--and no others--to a customer in New Jersey. (*Id.* at p. 878 (conc. opn. of Breyer, J.).) The New Jersey Supreme Court found that New Jersey could exercise personal jurisdiction over the English manufacturer under a stream-of-commerce theory. (*Id*. at p. 879 (conc. opn. of Breyer, J.).) The Supreme Court reversed, finding that the plaintiff had failed to establish that the foreign manufacturer engaged in conduct purposefully directed at the forum state to justify the exercise of personal jurisdiction. (*Id*. at pp. 879, 886-887 (conc. opn. of Breyer, J.).) Six justices agreed that New Jersey could not constitutionally assert personal jurisdiction over the foreign manufacturer based on the following facts: the distributor's single sale to a customer in the forum state; the manufacturer's desire that the distributor pursue customers throughout the United States; and the manufacturer's business-related contacts with various states other than the forum state. (*Id.* at pp. 886-888 (plur. opn. & conc. opn. of Breyer, J.).)

In his concurring opinion, Justice Breyer explained that "resolving [the] case require[d] no more than adhering to [existing] precedents." (*J. McIntyre*, 564 U.S. at p. 890 (conc. opn. of Breyer, J.).) As Justice Breyer pointed out, a "single isolated sale" from a distributor to a customer in the forum state, even if accompanied by the kind of sales effort indicated in *J. McIntyre*, has never been sufficient to establish minimum contacts between the manufacturer and the forum, under any stream-of-commerce interpretation. (*Id*. at pp. 888-889 (conc. opn. of Breyer, J.).) Thus, at a minimum, a plaintiff trying to establish personal jurisdiction over a foreign manufacturer must show a " 'regular . . . flow' " or " 'regular course' " of sales in the forum state, and/or some

17

additional efforts directed toward the forum state, such as "special state-related design, advertising, advice, [or] marketing." (*Id.* at p. 889 (conc. opn. of Breyer, J.).)

In 2013, after reviewing stream-of-commerce cases, including *Asahi* and *J. McIntyre*, this court concluded that "mere foreseeability that a product may enter a foreign state is insufficient to establish minimum contacts with a forum state. An inquiry into a foreign defendant's purposeful availment of the forum state's benefits must find more than merely entering a product into the stream of commerce with knowledge the product might enter the forum state." (*Bombardier Recreational Products, Inc. v. Dow Chemical Canada ULC* (2013) 216 Cal.App.4th 591, 602 [Canadian component parts manufacturer that supplied a component outside the forum state, that was incorporated by another company into a product that reached the forum state in the stream of commerce, was not subject to jurisdiction where the component parts manufacturer did not purposefully direct its conduct to, and had no other contacts with, the forum state], see *id.* at pp. 598-604.) In reaching this conclusion, this court observed that the United States Supreme Court "has not agreed on exactly what more besides foreseeability must be shown." (*Id.* at p. 602.)

Most recently, in 2021, the United States Supreme Court clarified that specific jurisdiction attaches in cases where a non-resident company serves a market for a product in the forum state and the product malfunctions there. (*Ford, supra*, 592 U.S. at p. 363.) In *Ford*, the Court discussed *World-Wide Volkswagen* (including the block-quoted language above), explaining that the exact fact pattern of that case--a resident plaintiff sues a global car company, extensively serving the state market in a vehicle, for an in-state accident--was "a paradigm example" of how specific jurisdiction works. (*Id.* at p. 366.) In doing so, the Court stated:

"[I]f Audi and Volkswagen's business deliberately extended into Oklahoma (among other States), then Oklahoma's courts could hold the companies accountable for a car's catching fire there—even though the vehicle had been designed and made

overseas and sold in New York.  For . . . a company thus 'purposefully avail[ing] itself '
of the Oklahoma auto market 'has clear notice' of its exposure in that State to suits
arising from local accidents involving its cars.  [Citation.]  And the company could do
something about that exposure:  It could 'act to alleviate the risk of burdensome litigation
by procuring insurance, passing the expected costs on to customers, or, if the risks are
[still] too great, severing its connection with the State.'  [Citation.]

"Our conclusion in *World-Wide Volkswagen*—though . . .  technically 'dicta,' . . .
has appeared and reappeared in many cases since.  So, for example, the Court in *Keeton*
[*v. Hustler Magazine, Inc*. (1984) 465 U.S. 770] invoked that part of *World-Wide*
*Volkswagen* to show that when a corporation has 'continuously and deliberately exploited
[a State's] market, it must reasonably anticipate being haled into [that State's] court[s]' to
defend actions 'based on' products causing injury there.  [Citations.]  On two other
occasions, we reaffirmed that rule by reciting the above block-quoted language verbatim.
[Citations.]  And in *Daimler*, we used the Audi/Volkswagen scenario as a paradigm case
of specific jurisdiction. . . .  Said the Court, to 'illustrate[ ]' specific jurisdiction's
'province[ ]':  A California court would exercise specific jurisdiction 'if a California
plaintiff, injured in a California accident involving a Daimler-manufactured vehicle, sued
Daimler [in that court] alleging that the vehicle was defectively designed.'  [Citation.]  As
in *World-Wide Volkswagen*, the Court did not limit jurisdiction to where the car was
designed, manufactured, or first sold."  (*Ford, supra*, 592 U.S. at pp. 363-364.)

19

As Audi correctly points out, *Ford* was not a stream-of-commerce case. However, *Ford* is instructive here insofar as the majority opinion discussed the contours of the stream-of-commerce theory of personal jurisdiction. *Ford* arose from separate lawsuits in which residents of Montana and Minnesota (respectively) sued Ford for defective designs concerning car accidents within those states. (*Ford, supra*, 592 U.S. at p. 356.) Ford had dealers that sold vehicles in those states, advertised in those states, and generally encouraged residents to buy and drive Ford vehicles. (*Id*. at pp. 355-356.) Ford conceded that it had purposefully availed itself of the privilege of conducting business in those states. (*Id*. at p. 361.) In challenging personal jurisdiction, Ford argued that the relatedness prong of specific jurisdiction was not satisfied because Ford had designed, manufactured, and sold the cars at issue not in Montana or Minnesota, but in other states. (*Ibid*.) In making this argument, Ford claimed that personal jurisdiction only attaches " 'if the defendant's forum conduct *gave* rise to the plaintiff's claims.' " (*Ibid*.) The Court rejected Ford's contention that a "but for" or strict causal link between a company's local activities and the plaintiff's injuries was required, finding it inconsistent with existing precedents. In doing so, the Court discussed *World-Wide Volkswagen* and explained that it had found specific jurisdiction in identical cases; specifically, cases where a company like Ford served a market for a product in the forum state and the product malfunctioned there. (*Id.*, at pp. 361-367; see *id*. at p. 355 [concluding that when a company serves a market for a product in a state and that product causes injury in the state to one of its residents, the state's courts may entertain the resulting suit].)

C. *Analysis*

We conclude the record here contains competent evidence establishing the existence of specific jurisdiction over Audi under a stream-of-commerce theory. This is because the record shows that Audi, through its distributor VWGoA, intentionally placed its vehicles into the regular flow of commerce to the United States, including to

20

California.  In reaching this conclusion, we are mindful that, as discussed, the United States Supreme Court has not agreed on the precise requirements necessary to establish specific jurisdiction under a stream-of-commerce theory beyond foreseeability that a product may enter the forum state.  However, under any of the analyses articulated by the various lead opinions, there is enough in this particular case for Audi to be properly summoned.

Applying the relevant criteria, the minimum contacts standard is met under the rule announced in *World-Wide Volkswagen*.  (*World-Wide Volkswagen, supra,* 444 U.S. at pp. 297-298.)  The assertion of specific jurisdiction over Audi is also proper under the stricter steam-of-commerce plus approach articulated by Justice O'Connor in *Asahi*.  (See *Asahi, supra*, 480 U.S. at pp. 112-113 (plur. opn. of O'Connor, J.) [marketing a product through a distributor who has agreed to serve as the sales agent in the forum state is the type of "additional conduct" necessary to establish specific jurisdiction under the stream-of-commerce plus approach].)  As we have described above, *J. McIntyre* also confirms that, "at a minimum, a plaintiff trying to establish personal jurisdiction over a foreign manufacturer must show a " 'regular . . . flow' " or " 'regular course' " of sales in the forum state, and*/or* some additional efforts directed toward the forum state, such as "special state-related design, advertising, advice, [or] marketing."  (*J. McIntyre*, 564 U.S. at p. 889 (conc. opn. of Breyer, J.).)  Tellingly, *J. McIntyre* confirms that "additional efforts" are required only if "regular flow" or "regular course of sales" in the forum state are not shown.  Here, the regular flow of Audi's cars to California is evidenced by the record as a whole.  Although Audi broadly argues that "[f]or case-specific jurisdiction in a product-liability case, the defendant ITSELF must have conducted relevant activities in the forum State," as we have described, under the controlling jurisprudence including *World-Wide Volkswagen*, *Asahi,* and even *J. McIntyre*, the involvement of Audi itself within the forum state is not necessarily required.  If, as here, Audi is marketing a product through a distributor who has agreed to serve as the sales agent in the United States,

21

including California, and the evidence shows a regular flow of that product into the state, jurisdiction is properly found.

The record reflects that Audi markets its products through VWGoA, which has agreed to serve as a sales agent in the United States, including California. In the trial court, Audi admitted that "the Audi AG-manufactured vehicles that VWGoA markets and sells in California are designed and manufactured to be sold throughout the United States" and that "VWGoA sells . . . Audi vehicles to authorized dealers in the United States; those dealers then sell vehicles to consumers." VWGoA is the exclusive entity that imports, distributes (to authorized dealerships), markets, and advertises Audi vehicles throughout the United States, including in California. Audi's expert implicitly acknowledged regular sales to California, setting forth that Audi does not earn additional money when its cars are sold by VWGoA in California (as opposed to other states) and that the "Audi AG-manufactured vehicles *that VWGoA markets and sells in California* are designed and sold to be sold throughout the United States . . . ." (Italics added.) In its briefing on appeal, Audi acknowledges that VWGoA has extensive dealings with California, including delivery of hundreds of thousands of Audi vehicles to the United States and national advertising that includes California, and that there are a large number of Audi dealerships (and at least some customers requiring product support) in California. At oral argument, Audi confirmed its position that no amount of discovery or additional information would change its argument that without proof of its *direct* contact with California, this state's courts were powerless to assert jurisdiction over it. When asked, Audi confirmed its position that regardless of the outcome of any additional discovery that might be sought, regardless of the presence of multiple Audi dealerships in California, "none of it matters," because at bottom these are two German companies and Audi did not directly sell its cars in California. (See *Artal v. Allen* (2003) 111 Cal.App.4th 273, 275, fn. 2 [" '[B]riefs and argument . . . are reliable indications of a party's position on the facts as well as the law, and a reviewing court may make use of

22

statements therein as admissions against the party' "]; *Lueras v. BAC Home Loans Servicing, LP* (2013) 221 Cal.App.4th 49, 93 (conc. & dis. opn. of Thompson, J.)  But this broad assertion by Audi is not the law.

As plaintiffs pointed out in their trial court briefing, this case presents a nearly identical fact pattern to that which the United States Supreme Court has used as the "paradigm example" of how specific jurisdiction works--a resident plaintiff sues a global car company, extensively serving the state market in a vehicle, for an in-state accident. (See *Ford, supra*, 592 U.S. at p. 366; see *id*. at p. 364 [explaining that the high court "used the Audi/Volkswagen scenario" from *World-Wide Volkswagen* "as a paradigm case of specific jurisdiction"].)  The admitted evidence from Audi itself, in the form of the Stadler declaration, showed an indirect relationship among the foreign manufacturer (Audi), the forum (California), and the litigation--the essential foundation of specific jurisdiction.  (*Id.*, at p. 365.)  The record supports the conclusion that Audi intentionally and purposefully engaged a national distributor (VWGoA) to target and exploit the automobile market in California for Audi's economic benefit.  Indeed, the record reflects that Audi deliberately and systematically (albeit indirectly) served the market for automobiles in California for the very vehicle that plaintiffs alleged was defective and caused injuries in California.  The record makes clear that there is a "regular flow" of vehicles from Audi to VWGoA to Audi-authorized dealerships across the United States, including California.  To the extent Audi concedes there is evidence of sales throughout the United States but then disavows an intent to sell in California, this position appears uninformed if not disingenuous.  (See *In re Automobile Antitrust Cases I & II* (2005) 135 Cal.App.4th 100, 106 [observing that California was one of the top motor vehicle markets in the world and the largest market for motor vehicles in the United States].)

In any event, the record reflects that there is an Audi dealership in Santa Monica, and Audi has never argued or suggested that this dealership is the only Audi dealership in California.  In the trial court (and now on appeal), Audi insisted that the number of Audi-

authorized dealerships in California was not relevant to the jurisdictional analysis, as the critical facts were that *VWGoA* (as opposed to Audi) acquires Audi-manufactured vehicles from Audi in Germany, imports them into the United States, markets them in the United States, and distributes them to dealerships in the United States, including California.  Notwithstanding the lack of evidence in the trial court as to the exact amount of authorized Audi dealerships in California, the record (as we have discussed) contains ample evidence detailing how Audi purposefully and systematically serves the automobile market in California through its relationship with VWGoA.  (See *Ford, supra*, 592 U.S. at pp. 363-364 [discussing *World-Wide Volkswagen* and explaining that if Audi and Volkswagen's business "deliberately extended" into the forum state, then that state "could hold the companies accountable" for a vehicle that malfunctions there, even though the vehicle had been designed and manufactured overseas and first sold outside the forum].)

Under the circumstances presented, the purposeful availment and relatedness requirements of specific jurisdiction were satisfied.  Given the evidence demonstrating that Audi has continuously and deliberately exploited California's automobile market for its economic benefit through VWGoA, Audi must reasonably anticipate being haled into California courts to defend the very type of action this case presents:  a products liability action seeking to recover damages for injuries allegedly caused by a defective Audi vehicle in California.  (See *Ford*, *supra*, 592 U.S. at p. 359 [a defendant purposefully avails itself of the forum's benefits if it deliberately reaches out beyond its home by exploiting a market in the forum state]; *Snowney, supra*, 35 Cal.4th at p. 1062 [the purposeful availment requirement focuses on the defendant's intentionality and is satisfied when the defendant purposefully and voluntarily directs its activities toward the forum so that it should expect, because of the benefit it receives, to be subject to the court's jurisdiction based on its contacts with the forum]; *World-Wide Volkswagen*, *supra*, 444 U.S. at p. 297 ["if the sale of a product of a manufacturer or distributor such

as Audi or Volkswagen is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve, directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others"].) To be sure, this is not a case where Audi is being haled into a California court as the result of "random," "fortuitous," or "attenuated" contacts, or of the unilateral activity of a third party. (See *Snowney, supra*, 35 Cal.4th at p. 1063 [describing the circumstances establishing purposeful availment].) Rather, Audi's conduct and connection with California are such that it had clear notice it would be subject to suit here. (*World-Wide Volkswagen*, at p. 297.)

In urging a contrary result, Audi insists (as it did in the trial court) that a foreign manufacturer is not subject to personal jurisdiction in California simply because it is aware that an American distributor will import, distribute, and sell its products in the United States, including California. We do not disagree. But more than mere awareness is apparent in this case. In support of its position, Audi primarily relies upon *J. McIntyre*. However, that case is readily distinguishable. In *J. McIntyre*, there were insufficient contacts between the foreign manufacture of the product (scrap metal machine) and the forum state (New Jersey) to justify the assertion of personal jurisdiction. There was no "regular flow" or "regular course" of sales in the forum state; here, as we have discussed, there is.

In short, because the circumstances of this case are clearly distinguishable from those presented in *J. McIntyre*, we find Audi's reliance on *J. McIntyre* to argue lack of jurisdiction over Audi misplaced. For the reasons explained *ante*, the record contains sufficient evidence to support the exercise of personal jurisdiction over Audi.

## II

### *Fair Play and Substantial Justice*

Having concluded that the plaintiffs sufficiently satisfied the purposeful availment and relatedness requirements of specific jurisdiction, the remaining issue is whether the assertion of personal jurisdiction over Audi would comport with notions of "fair play and substantial justice." In other words, the question is whether the exercise of specific jurisdiction over Audi by California courts is fair and reasonable.

As discussed, when (as here) the plaintiffs meet their initial burden of demonstrating facts justifying the exercise of specific jurisdiction, the burden shifts to the defendant to present a "compelling case" that the exercise of jurisdiction would be unreasonable. (*Snowney, supra*, 35 Cal.4th at pp. 1062, 1070; *Burger King Corp. v. Rudzewicz, supra,* 471 U.S. at pp. 476-477.) In making this determination, courts consider the following factors: the burden on the defendant, the interests of the forum state, the plaintiff's interest in obtaining relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several states in furthering fundamental substantive social policies. (*Snowney,* at p. 1070; see also *World-Wide Volkswagen, supra*, 444 U.S. at p. 292.) "When minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant." (*Asahi, supra*, 480 U.S. at p. 114 (plur. opn. of O'Connor, J.).)

On this record, we have little difficulty in finding that the exercise of personal jurisdiction over Audi is fair and reasonable. In the trial court (and now on appeal), Audi failed to identify any unconscionable burden of defending suit in California, nor has it suggested that litigating this matter in California would infringe any significant

26

sovereignty interests of another jurisdiction.[6]  And we discern no basis for concluding that it would be unfair or unreasonable to require Audi to defend against this action in California.  Indeed, in exploiting the automobile market in California through is national distributor (VWGoA), Audi enjoys the benefit and protection of California's laws, which create reciprocal obligations, including that the Audi-manufactured vehicles VWGoA markets and sells in California are safe for its citizens to use there.  As the United States Supreme Court has explained, a state court's enforcement of this obligation can " 'hardly be said to be undue.' " (*Ford, supra*, 592 U.S. at p. 368.)  Nor can it "be thought surprising" as an "automaker regularly marketing a vehicle in a State . . . has 'clear notice' that it will be subject to jurisdiction in the State's courts when the product malfunctions there (regardless of where it was first sold)." (*Ibid*.)  Although VWGoA is the entity that regularly markets and sells Audi vehicles in California, this is due to the "importer agreement" with Audi to do just that.  Audi is clearly aware of such activity, as set forth in the Stadler declaration.  As such, Audi has sufficient notice that it will be subject to suit in California when an Audi-manufactured vehicle malfunctions there.

The fairness and reasonableness of a California forum is strengthened by California's significant interests at stake in this litigation--providing residents with a convenient forum for redressing injuries inflicted by non-residents (including a foreign

---

[6] We note that Audi made little effort in the trial court to show that defending against this action in California would be unreasonable.  Without further elaboration, Audi simply stated the following in the background section of its motion papers:  "Defending this case in . . . California would be unduly burdensome for Audi . . . due to the language differences, the distance involved, and [its] lack of familiarity with the laws of . . . California."  Later, at the conclusion of the argument section of its motion, Audi added that it should not be compelled to litigate in California because "[t]he assertion of sovereign authority over a foreign company that conducted no relevant activities [there] is itself unreasonably burdensome."

manufacturer) and enforcing its own safety regulations.  (*Ford*, *supra*, 592 U.S. at p. 368.)

## DISPOSITION

The order granting the motion to quash summons for lack of personal jurisdiction is reversed.  The matter is remanded with directions to enter a new order denying the motion.  Plaintiffs shall recover their costs on appeal.  (Cal. Rules of Court, rule 8.278(a).)


                                        /s/

                                    Duarte, J.


I concur:


        /s/

Hull, Acting P. J.

RENNER, J., Dissenting.

This case turns on the purposeful availment requirement, which plaintiffs propose to satisfy using the stream of commerce theory. The majority ably traces the evolution of the theory in the Supreme Court, starting with *World-Wide Volkswagen Corp. v. Woodson* (1980) 444 U.S. 286, 298 (*World-Wide Volkswagen*) and ending with *J. McIntyre Machinery, Ltd. v. Nicastro* (2011) 564 U.S. 873, 885-886 (*J. McIntyre*). (Maj. opn., *ante*, at pp. 13-17.) The majority then concludes they need not choose any particular formulation of the theory because, "under any of the analyses articulated by the various lead opinions, there is enough in this particular case for Audi to be properly summoned." (Maj. opn., *ante*, at p. 21.) I share the majority's reluctance to enter the debate between stream of commerce theories. (See generally *Asahi Metal Industry Co. v. Superior Court of California* (1987) 480 U.S. 102, 112 (*Asahi*) (maj. opn. of O'Connor, J.); *id.* at p. 117 (conc. opn. of Brennan, J.); but see *Yamashita v. LG Chem, Ltd.* (9th Cir. 2023) 62 F.4th 496, 503 [adopting Justice O'Connor's " 'stream-of-commerce-plus test' "].) On the record before us, however, I would conclude plaintiffs failed to present competent evidence of jurisdictional facts satisfying even the most lenient standard. Accordingly, I would affirm.

After *J. McIntyre*, a plaintiff trying to establish personal jurisdiction over a foreign corporation must, at the very least, show a " 'regular . . . flow' or 'regular course' of sales" in the forum state, or some additional efforts directed toward the forum state, such as a special state-related design, advertising, advice, or marketing. (*J. McIntyre, supra*, 564 U.S. at p. 889 (conc. opn. of Breyer, J.).) It is not enough to say the foreign corporation targeted the United States generally or sold products to an American distributor knowing they would ultimately be sold in the United States. (*Id.* at p. 891 (conc. opn. of Breyer, J.) [rejecting the view that "a producer is subject to jurisdiction for a products-liability action so long as it 'knows or reasonably should know that its products are distributed through a nationwide distribution system that *might* lead to those

1

products being sold in any of the fifty states' "].)  Although the majority accurately characterizes Justice Breyer's concurring opinion in *J. McIntyre* as "controlling," (maj. opn., *ante*, at p. 16) they seem to ignore the conclusion, compelled by plurality and concurring opinions alike, that the relevant forum is California, not the United States.  (*J. McIntyre, supra*, at p. 891 (conc. opn. of Breyer, J.); and see *id.* at p. 886 (plur. opn.) ["Here the question concerns the authority of a New Jersey state court to exercise jurisdiction, so it is petitioner's purposeful contacts with New Jersey, not with the United States, that alone are relevant"].)

Rather than require evidence that Audi AG conducts a regular course of business in California, the majority seems content to rely on the German manufacturer's reputation as "a successful global automotive company."  (Maj. opn., *ante*, at p. 3.)  They point to evidence that: (1) Audi AG has a relationship with Volkswagen Group of America, Inc. (VWGoA); (2) VWGoA sells Audi-manufactured cars in the United States; and (3) one such car—the subject Audi Q7—was sold in Santa Monica, California.  (Maj. opn., *ante*, at pp. 21-24.)  From these facts, the majority concludes "Audi is marketing a product through a distributor who has agreed to serve as the sales agent in the United States, including California, and the evidence shows a regular flow of that product into the state." (Maj. opn., *ante*, at pp. 21-22.)  Reaching this conclusion requires the majority to bend over backwards to find evidence of California contacts where there are none.

For example, the majority attaches great significance to Audi AG's relationship with VWGoA.  (Maj. opn., *ante*, at p. 22.)  But we are given scant information concerning VWGoA's contacts with California, and no reason to suppose those contacts should be imputed to Audi AG.  Plaintiffs do not suggest Audi AG directs VWGoA's activities in California or anywhere else.  (Cf. *Daimler AG v. Bauman* (2014) 571 U.S. 117, 135, fn. 13 ["a corporation can purposefully avail itself of a forum by directing its agents or distributors to take action there"].)  Nor do they attempt to base jurisdiction on an alter ego theory.  (Cf. *Williams v. Yamaha Motor Co.* (9th Cir. 2017) 851 F.3d 1015,

1021.)  Instead, plaintiffs focus on Audi AG's "interdependent" relationship with VWGoA and contacts with the United States as a whole.  The majority takes plaintiffs' argument one step further, stating VWGoA "has agreed to serve as a sales agent in the United States, including California."  (Maj. opn., *ante*, at pp. 21-22.)  But the record does not demonstrate the existence of any particular agreement to serve as Audi AG's sales agent *in California*  and evidence of VWGoA's activities around the country do not establish any course of sales here, even assuming they could be imputed to Audi AG and accepting that California may be an important market.[7]  (But see *World-Wide Volkswagen, supra,* 444 U.S. at p. 298 ["the mere 'unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State' "].)

The majority appears to recognize as much and tries to fill the evidentiary hole by arguing:  "To the extent Audi concedes there is evidence of sales throughout the United States but then disavows an intent to sell in California, this position appears uninformed if not disingenuous."  (Maj. opn., *ante*, at p. 23.)  This argument turns the burden of proof on its head.  Contrary to the majority's suggestion, it is plaintiffs' burden to provide "competent evidence of jurisdictional facts" in the first instance.  (*Automobile Antitrust Cases, supra,* 135 Cal.App.4th at p. 110; see also *Buchanan v. Soto* (2015) 241 Cal.App.4th 1353, 1362 ["The plaintiff must come forward with affidavits and other competent evidence to carry this burden"].)  Audi AG does not have an initial burden to disprove such facts.

---

[7]  The majority relies on *In re Automobile Antitrust Cases I & II* (2005) 135 Cal.App.4th 100, 106 (*Automobile Antitrust Cases*) for the proposition that California "was one of the top motor vehicle markets in the world and the largest market for motor vehicles in the United States" some 20 years ago.  (Maj. opn., *ante*, at p. 23.)  I have no quarrel with the idea that California may be an important market for automobiles.  But I am not convinced plaintiffs' burden of proof can be satisfied with decades-old dicta.

3

The majority's problems with the burden of proof do not end there. According to the majority, "the record reflects that there is an Audi dealership in Santa Monica, and Audi has never argued or suggested that this dealership is the only Audi dealership in California." (Maj. opn., *ante*, at p. 23.) Again, Audi AG does not have the initial burden to prove or disprove any jurisdictional facts, such as the existence or nonexistence of other Audi dealerships in California. (*Automobile Antitrust, supra*, 135 Cal.App.4th at p. 110.) In any event, the trial court sustained Audi AG's objections to plaintiffs' evidence concerning other Audi dealerships in California, and the majority disclaims reliance on evidence to which objections were made and sustained. (Maj. opn., *ante*, at p. 2.)

Reading the record as generously as possible, I can discern only two facts that could conceivably support an inference that Audi AG engaged in a regular flow or course of sales to California. First, the record indicates 224,111 Audi-manufactured cars were delivered to the United States in 2019. Second, the record establishes the subject Audi Q7 was sold by an Audi dealership in Santa Monica, California. These jurisdictional facts are essentially undisputed, but the inferences to be drawn from them are not.

A factfinder could infer that Audi-manufactured cars are delivered to the United States in similar numbers every year, and some substantial percentage of them must surely make their way to California, as the majority seems to believe. Alternatively, a factfinder could find only one California sale had been sufficiently shown, such that there was no basis for inferring a regular flow or course of sales to California. Determining whether Audi AG engages in a regular flow or course of sales to California thus requires " 'the drawing of inferences from the presented facts.' " (*CenterPoint Energy v. Superior Court* (2007) 157 Cal.App.4th 1101, 1119.) "In such a case, no pure question of law is presented, and an appellate court must apply the substantial evidence test to a trial court's ruling, giving deference to any inferences drawn by the trial court in support of its resolution of a particular question of law." (*Ibid.*) The trial court here was unwilling to infer from the evidence presented that Audi AG conducts substantial business in

4

California, and I would defer to the court's resolution of that issue. (See *Automobile Antitrust Cases, supra*, 135 Cal.App.4th at p. 114 ["We have no power to substitute our own assessment of the facts for that of the trial court if substantial evidence supports its finding"].) I would therefore join the trial court in finding plaintiffs failed to carry their burden of presenting competent evidence showing Audi AG purposefully availed itself of the privilege of conducting business in California.

*World-Wide Volkswagen,* on which the majority relies, does not convince me otherwise. (Maj. opn., *ante*, at pp. 13, 21-24.) The majority emphasizes *World-Wide Volkswagen*'s dicta that, " 'if the sale of a product of a manufacturer or distributor such as Audi or Volkswagen is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others.' " (Maj. opn., *ante*, at p. 13, quoting *World-Wide Volkswagen, supra,* 444 U.S. at p. 297 (majority's emphasis omitted).) The majority seems to particularly rely on the idea that Audi AG "indirectly" serves the California automobile market through VWGoA. (Maj. opn., *ante*, at p. 23.) But again, no evidence has been presented as to how many Audi-manufactured cars enter the California market through VWGoA over any particular time frame, or whether Audi AG derives substantial or regular revenue from such sales. Given the state of our record, I cannot say that Audi AG "indirectly" serves the California market (whatever that means), nor do I believe the present case requires us to do so.

The majority's reliance on *Ford Motor Company v. Montana Eighth Judicial District Court* (2021) 592 U.S. 351, 361-367 (*Ford Motor Company*) seems to me unpersuasive for much the same reason. (Maj. opn., *ante*, at pp. 18-20.) Unlike Audi AG, the American car company did not deny conducting "substantial business" in the forum states, "among other things, advertising, selling, and servicing the model of vehicle

5

the suit claims is defective." (*Ford Motor Company, supra*, at p. 355.) Thus, the question before the high court was not whether Ford had sufficient minimum contacts with the forum states, but whether jurisdiction was proper when the car at issue was not sold, designed, or manufactured in those states. (*Ibid.*) In answering that question, the court found jurisdiction was proper because "Ford had systematically served a market in Montana and Minnesota for the very vehicles that the plaintiffs allege malfunctioned and injured them in those States," creating "a strong 'relationship among the defendant, the forum, and the litigation'—the 'essential foundation' of specific jurisdiction." (*Id.* at p. 365.) By contrast, plaintiffs here have not presented jurisdictional facts showing Audi AG—as opposed to VWGoA—marketed, sold, or distributed cars in California. Nor have they offered evidence that Audi AG directs VWGoA's activities in California, such as they are. That being so, I am unable to join the majority in concluding that Audi AG "deliberately and systematically (albeit indirectly) served the market for automobiles in California." (Maj. opn., *ante*, at p. 23.)

On the record before us, I would accept the trial court's finding that, "[t]he only evidence presented by plaintiffs to demonstrate Audi AG's economic activity in California is the sale of the Audi Q7 in Santa Monica." I would then affirm on the ground that the "singular sale of an Audi vehicle" (maj. opn., *ante*, at p. 8) does not establish a regular flow or regular course of sales to California, even under *World-Wide Volkswagen.* (See *World-Wide Volkswagen, supra*, 444 U.S. at p. 297; see also *J. McIntyre, supra*, 564 U.S. at p. 888 ["None of our precedents finds that a single isolated sale, even if accompanied by the kind of sales effort indicated here, is sufficient"].)

6

Doing so would not only respect the inferences drawn by the trial court, it would spare us the task of deciding difficult constitutional questions on an incomplete record.  I would save those questions for another day and a more complete record.

_____/s/_____

Renner, J.
